UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| JAMES D. ROGERS, | ) | |
| --- | --- | --- |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:04CV00407 AGF |
| | ) | |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This action is before the Court for judicial review of the final decision of the Commissioner of Social Security denying plaintiff James Rogers' application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401, et seq., and supplemental security income (SSI) under Title XVI of the Act, 42 U.S.C. § 1381, et seq.[1] For the reasons set forth below, the decision of the ALJ shall be affirmed.    Plaintiff, who was born on June 21, 1965, applied for SSI and disability benefits on January 11, 2002, claiming a disability onset date of October 24, 2000, based on lower back pain and right leg problems. A previous application for disability benefits had been denied on October 23, 2000. In that case, the ALJ found that Plaintiff's claimed impairment -- problems with his right leg post surgery in 1993 -- was not a severe impairment. Tr. at 60-64. Plaintiff filed an action for judicial review on April 4,

---

[1] The parties have consented to the exercise of authority by the undersigned United States Magistrate Judge under 28 U.S.C. § 636(c).

2003, Rogers v. Barnhart, 4:03CV425 HEA (TIA), and the Honorable Henry E. Autrey affirmed the decision of the Commissioner on February 25, 2004. Meanwhile, Plaintiff's applications in the present case were initially denied, and Plaintiff requested a hearing before an ALJ. A hearing was held on May 14, 2003, before a different ALJ. On September 25, 2003, the ALJ issued a decision that Plaintiff was not disabled as defined by the Act. The Appeals Council of the Social Security Administration denied Plaintiff's request for review in the present case on February 27, 2004. Plaintiff has thus exhausted all administrative remedies, and the ALJ's September 25, 2003 decision stands as the final agency action now under review.

## SUMMARY OF ALJ'S FINDINGS

Following the evidentiary hearing, the ALJ made the following findings:

1. Plaintiff met the nondisability requirements for a period of disability and disability insurance benefits and was insured for benefits through the date of the ALJ's decision.

2. Plaintiff had not engaged in substantial gainful activity since October 24, 2000.

3. Plaintiff had the following medically determinable impairments: a history of tibial fracture in 1993, and a history of adjustment disorder and depressed mood diagnosed on one occasion in July 2000. Due to mental impairments, Plaintiff had either no restrictions or only mild restrictions in activities of daily living and either no difficulties or only mild difficulties in maintaining social functioning, concentration, pace, or persistence. Plaintiff had no episodes of decompensation of extended duration. Plaintiff's mental impairments did not meet or equal the "C" criteria of Listings 12.02, 12.03, 12.04, or 12.06 in 20 C.F.R. Part 404, Subpart P, Appendix 1.

4. Plaintiff did not have any impairment or impairments that significantly limited his ability to perform basic work-related activities; therefore, Plaintiff did not have a severe impairment.

5. Plaintiff was not under a disability as defined by the Act at any time through the date of the ALJ's decision.

Plaintiff argues that the ALJ committed reversible error by (1) discrediting Plaintiff's subjective complaints of disabling pain without properly considering the evidence that Plaintiff was financially unable to pay for medical care; and (2) failing to supplement the record with medical reports regarding treatment Plaintiff alleged he received following a car accident in April 2002.

## BACKGROUND

**Evidentiary Hearing**

Plaintiff testified at the May 14, 2003 hearing that he lived with his mother and some nieces and nephews. He had two children, ages 6½ and 15, who did not live with him. He testified that he completed 11th grade and had some vocational training in data entry. Plaintiff (who was 6' tall and weighed 210-220 pounds) testified that he last worked in 1999 for about three months at a recycling company sorting plastic from trash, and that he was fired from that job because he could not keep up with the work pace. Plaintiff testified that before that he had worked as a forklift operator for three years for two different companies, one of which went out of business and one of which relocated. Before that he worked as a cook at a restaurant off and on for about six years, but was fired because of lateness. Plaintiff testified that he worked at a medical center in

3

housekeeping in 1984 for about six months, a job he left after a change in management. Tr. at 32-37.

Plaintiff testified that he was the victim of an assault in 1993 as a result of which his right leg and kneecap were injured. He alleged that he still had sharp pain almost every day, that he could barely stand on his right leg for any period of time, and that he limped most of the time. He testified that he took Tylenol and ibuprofen for the problem with his leg, and that the medications "calmed it down" but it still hurt, especially when the weather changed and in the cold. Plaintiff testified that he was not under a doctor's care for the leg because he could not afford to see a doctor. Tr. at 37-38.

Plaintiff testified that he had a problem with high blood pressure for which he was drinking vinegar, an old home remedy. He testified that he did not have medications for high blood pressure. He also testified that he had had lower back pain since he was in a car accident, which he later stated occurred in April 2002. Plaintiff claimed that his lower back hurt him all the time, and that on a scale of one to ten, with ten being excruciating pain, this pain was a ten. Plaintiff stated that he went to a chiropractor after the accident -- Dr. Salzberg -- who treated Plaintiff's back with electric shocks, ice packs, and a neck bracelet. Plaintiff described sharp pains radiating from his lower back into his arms and legs and stiffness in his neck, all starting after the accident. Tr. at 39-41, 51.

Plaintiff was then asked by his attorney if he experienced depression, and Plaintiff responded that he did. He testified that he would cry sometimes and wish he were dead because he had not worked in a while and was not able to take care of himself or his

4

children.  He testified that he has these feelings every day, but that he had not seen any mental health professionals about it.  Returning to his physical problems, Plaintiff testified that he could walk about one block without having to stop and could stand or sit for about 10 to 15 minutes before having to change positions due to his back pain.  He testified that he had problems going up and down steps due to problems with his right leg, which would go numb and give out.  Plaintiff thought that he could lift 25 to 30 pounds.  He also testified that he could not squat because of his back problems.  Tr. at 43-45.

When asked how he was supporting himself, Plaintiff stated that his mother and a new girlfriend helped him out, and that he got food stamps.  He stated that he received no checks and did not have a "medical card" (presumably, through Medicaid).  Plaintiff testified that he sometimes needed help getting his shoes on, and that he did no household work; the most he could do was take out the trash.  He testified that he could not stand long enough to cook.  Plaintiff testified that he did not socialize outside the house, did not belong to any clubs or organizations, and had not been to church in a few years because he was depressed.[2]  He testified that on an average day he watched TV and just sat around "look[ing] depressed."  Plaintiff testified that he looked for work but people were not hiring and, in any event, he could not hold a job such as operating a forklift or doing housekeeping for more than a few days because of his leg.  Tr. at 45-52.

---

[2]    The Court notes that on the Claimant's Questionnaire accompanying his applications, Plaintiff stated that he went to church twice a month when he could get a ride.  Tr. at 108.

**Medical Record**

The bulk of the medical record in this case was reviewed by the Court in Plaintiff's previous case, including the following: (1) notes from St. Louis Regional Medical Center from November 19, 1993 through July 13, 1994, documenting Plaintiff's progress following surgery on his right knee in early November 2003 for a fractured right tibia; (2) a report of consultative physician, Elbert Cason, M.D., who examined Plaintiff on January 12, 1999; (3) an x-ray report dated January 12, 2000, of Plaintiff's right knee; (4) a Physical RFC Assessment completed on February 15, 2000, by non-examining consultative orthopedist, Anver Tayob, M.D.; and (5) a psychological evaluation report and a statement of mental ability to do work-related activities prepared by consultative psychologist Paul Rexroat, Ph.D., who examined Plaintiff on July 19, 2000.

The notes from St. Louis Regional Medical Center dated February 10, 1994, indicate that Plaintiff complained of continuing pain and swelling, and limited range of motion of his right knee. Tr. at 237. The notes from April 19, 2004, state that Plaintiff's wounds were clean and dry, and that he needed aggressive physical therapy. They further state that Plaintiff tolerated the examination well and was able to understand and cooperate with the treatment regimen. Tr. at 233. Notes dated July 13, 1994, indicate that Plaintiff was non-compliant with physical therapy, having missed several appointments. Tr. at 231.

Dr. Cason's report, prepared following an examination of Plaintiff on January 12, 1999, stated that Plaintiff claimed he was almost an invalid following his knee surgery, was unable to work, and could barely walk. The report noted that Plaintiff used a cane,

6

which was not prescribed by a doctor. The only medication Plaintiff was taking was over-the-counter pain medication, and Plaintiff smoked one to two packs of cigarettes and drank one or two beers daily. Dr. Cason noted that when Plaintiff stood, he had to lean on something for support because he would not bear much weight on his right leg. On examination, Plaintiff had full range of motion of his back, without any tenderness or paravertebral muscle spasm. Straight leg raises were 90 degrees on the left and 70 degrees on the right. Tr. at 241.

Dr. Cason noted that Plaintiff could not heel and toe walk or squat because of his knee, and that he stood awkwardly with his right leg extended out away from his body and leaning towards the left. Plaintiff's range of motion for his knee was 150 degrees on the left, whereas it was only 20 degrees on the right. Dr. Cason stated that Plaintiff would hardly bend his right leg at all. Dr. Cason opined that Plaintiff "was not giving his best effort to perform these tests." Dr. Cason reported that Plaintiff's gait was with an extreme limp on the right side with or without the cane. Tr. at 242.

Dr. Cason reported that he found no pain or swelling in any of Plaintiff's joints and no evidence of instability of Plaintiff's right knee, but that when he touched Plaintiff's right knee, Plaintiff jumped. Dr. Cason ordered x-rays of Plaintiff's right knee, which were taken that day and which showed that the bones were in their normal configuration and that there were mild degenerative changes in the knee joint. Tr. at 242-43.

Dr. Tayob's physical RFC assessment of February 15, 2000, indicated that from his review of the records, Plaintiff could occasionally lift 50 pounds, frequently lift 25 pounds, stand and/or walk for a total of six hours in an eight-hour workday, sit for a total

7

of less than six hours in an eight-hour workday, and push or pull without limitation. Dr. Tayob further indicated that Plaintiff could climb, balance, stoop, crouch, and crawl frequently, but could kneel only occasionally. Dr. Tayob indicated that Plaintiff had no manipulative, visual, or communicative limitations. Dr. Tayob concluded from his review of the record that Plaintiff's subjective complaints of pain and symptoms were only partially credible. Tr. at 219-23. Dr. Tayob noted that as recently as December 1998, Plaintiff had worked driving a forklift, which required knee flexion of 100 degrees or more, yet at the time of his examination with Dr. Cason, he had exhibited only 20 degrees flexion. Dr. Tayob opined that this "markedly compromised" Plaintiff's credibility. Tr. 224.

The record includes a note by a disability counselor that Plaintiff's past work as a forklift operator most closely matched the job of industrial truck operator, listed in the Dictionary of Occupational Titles (DOT) and described as medium work; and that Dr. Tayob's RFC assessment showed that Plaintiff could return to this job. Tr. at 226.

Dr. Rexroat wrote in his psychological evaluation report, prepared following an examination of Plaintiff on July 19, 2000, that Plaintiff described symptoms of depression (feeling sad, crying, wishing he were dead) which lead Dr. Rexroat to believe Plaintiff was suffering from an adjustment disorder with depressed mood. Dr. Rexroat believed that Plaintiff was able to understand and remember simple instructions and had at least the minimal ability to interact socially and adapt to his environment. Tr. at 249. Based upon Plaintiff's description of his daily activities and social functioning, Dr. Rexroat concluded that there appeared to be mild limitations with respect to the former

8

ability and moderate limitations with respect to the latter. Dr. Rexroat reported that Plaintiff exhibited generally adequate concentration, persistence, pace, and memory, except when Dr. Rexroat thought Plaintiff was malingering on the cognitive functioning portion of the exam. Dr. Rexroat assigned Plaintiff a Global Assessment of Functioning (GAF) score of 72.[3] Tr. at 250-51.

In Dr. Rexroat's separate statement on Plaintiff's mental ability to do work related activities, Dr. Rexroat indicated that Plaintiff's ability to understand, remember, and carry out detailed instructions was only fair, with "fair" defined by the form as the ability to perform the activity satisfactorily some of the time. He also indicated that Plaintiff's ability to respond appropriately to supervision, co-workers, and work pressures was affected by his mental impairment. Dr. Rexroat wrote that Plaintiff was "mildly depressed, but not incapacitated." Tr. at 252-53.

The medical record in the present case includes two items not mentioned by the ALJ or the Court in the previous case: a consultative report by Dr. Cason following an examination of Plaintiff on March 4, 2002; and case action notes by Dr. Tayob from March 18, 2002. Dr. Cason noted in his new report that Plaintiff's chief complaints were

---

[3] A GAF score represents a clinician's judgment of an individual's overall ability to function in social, school, or occupational settings, not including impairments due to physical or environmental limitations. Diagnostic & Statistical Manual of Mental Disorders (4th ed.) (DSM-IV) at 32. GAF scores of 41 to 50 reflect "serious" impairments in social, occupational, or school functioning; scores of 51-60 indicate "moderate" difficulties in these areas; scores of 61-70 indicate "mild" difficulties; scores of 71-80 indicate "slight" difficulties and only transient and expected reactions to psychological stressors.

9

lower back pain and right leg problems.  According to Dr. Cason, Plaintiff reported that he had had the lower back pain for four or five years, that he only took over-the-counter medications for it, and that it hurt most of the time.  Plaintiff reported that he had had problems with his right knee since the 1993 assault.  Dr. Cason noted that Plaintiff smoked two packs of cigarettes a day.  Tr. at 254.

On examination of Plaintiff's back, Dr. Cason noted that Plaintiff had full range of motion without any paravertebral muscle spasm, and that straight leg raises were negative.  Dr. Cason noted, however, that Plaintiff had paravertebral muscle tenderness which was "exaggerated" -- this is, if Dr. Cason just touched the skin of Plaintiff's back, Plaintiff jumped.  Dr. Cason reported that Plaintiff could heel and toe stand but would not squat, claiming that his right leg would give way.  Dr. Cason reported that there was no evidence of tenderness on palpation of the right knee.  Plaintiff's gait appeared "fairly normal," and Plaintiff used no assistive device.  Back, knee, ankle, hand, and wrist motions, as well as major muscle group strengths of upper and lower extremities, were all normal.  Dr. Cason noted that Plaintiff seemed alert and oriented "times three" (person, place, and time).  Tr. at 255-56.

Dr. Tayob's March 18, 2002 notes referenced above state that since the ALJ's decision in Plaintiff's previous case there had been no evidence of medical treatment for Plaintiff's alleged physical problems.  Dr. Tayob reviewed Dr. Cason's new report and concluded that Plaintiff did not have severe physical problems.  Tr. at 259-60.

The record before the Court also includes two other items not mentioned in the previous case:  a written statement dated February 9, 2002, from a friend of Plaintiff's,

Linda Kinnel; and a form dated from April 2003, in which Plaintiff updated the medical record. In her letter, Ms. Kinnel indicated that she had known Plaintiff for ten years and saw him daily. Ms. Kinnel wrote that Plaintiff suffers from daily pain in the lower back and knees, and that as time goes on he seems to be in more pain in his lower back more often. She wrote that Plaintiff stayed to himself, had a constant headache, and was irritable. She stated that Plaintiff could not lift anything heavy or stand for too long, and that he could not get a job because he could not pass any physical due to these problems. Tr. at 110. In the form updating his medical record, Plaintiff noted that in the spring of 2002 he saw Dr. Steven Salzberg, who said that Plaintiff's back needed a second opinion. Tr. at 116.

**ALJ's Decision**

The ALJ held that Plaintiff's work record neither significantly added or detracted from the credibility of Plaintiff's allegations of disability. The ALJ then held that "the available evidence does not support the severity of the impairments alleged by the claimant." The ALJ pointed to the fact that with the exception of the treatment for the fractured right tibia in late 1993 and early 1994, there was no documented evidence of medical treatment for Plaintiff's physical impairments. Tr. at 18.

The ALJ did not believe that Dr. Rexroat's opinion that Plaintiff had only a fair ability to understand, remember, and carry out detailed instructions was supported by the record. The ALJ stated that although Plaintiff testified at the hearing that he was depressed and cried occasionally, there was no evidence that Plaintiff ever sought medical treatment for depression. The ALJ observed that Plaintiff did not display any

11

signs of "significant mental dysfunction" during the course of the hearing. The ALJ added that even the diagnosis of adjustment disorder with depressed mood was based on Plaintiff's own report of his symptoms, which in light of his malingering as found by Dr. Rexroat, was questionable. The ALJ noted that according to Dr. Cason's March 4, 2002 report, Plaintiff made no mention of any symptoms of depression or other mental impairment. Tr. at 19-20.

The ALJ commented that there was no evidence of emergency room or other treatment as a result of the "alleged" car accident in April 2002. The ALJ noted that no records were obtained from Dr. Salzberg in response to a request, and there was no evidence that Plaintiff sought any treatment from Dr. Salzberg or anyone else since the spring of April 2002. Tr. at 20.

The ALJ did not believe that Dr. Tayob's February 2000 physical RFC assessment, which limited Plaintiff to work at the medium level of exertion[4] with an additional limitation of only occasional kneeling, was supported by Dr. Cason's subsequent examination and the dearth of medical treatment. The ALJ stated that the evidence did not support a finding that Plaintiff had ever been refused medical treatment because of an inability to pay. The ALJ observed that Plaintiff appeared to be in good physical condition at the hearing with "no credible signs of significant motor deficits or serious discomfort." Tr. at 20-21.

---

[4] Medium work is defined by the relevant regulations as requiring lifting 50 pounds occasionally and 25 pounds frequently, standing or walking off and on for a total of approximately six hours in an eight-hour workday, and lifting or carry objects weighing up to 25 pounds frequently. 20 C.F.R. § 404.1567(c), SSR 83-10.

The ALJ discounted the letter from Ms. Kinnel because she was not medically trained and was an interested party, and because her statement, like Plaintiff's testimony, was not consistent with the medical record. The ALJ found that Plaintiff's testimony was not credible, and that he did not have an impairment or combination of impairments that significantly limited his ability to perform work-related activities. The ALJ then held that even assuming "for the sake of argument" the mental limitations as opined by Dr. Rexroat and the physical RFC assessed by Dr. Tayob, Plaintiff could return to his past relevant work as a cook and forklift operator. Tr. at 21.

## DISCUSSION

**Standard of Review and Statutory Framework**

In reviewing the denial of disability benefits, a court must affirm the Commissioner's decision "so long as it conforms to the law and is supported by substantial evidence on the record as a whole." Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (citation omitted). "Substantial evidence is that which a 'reasonable mind might accept as adequate to support a conclusion,' whereas substantial evidence on the record as a whole entails 'a more scrutinizing analysis.'" Id. (quoting Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir.1989)). The court's review "'is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision;'" the court must also take into account whatever in the record fairly detracts from that decision. Id. (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001)). Reversal is not warranted, however, "'merely because substantial evidence would have supported an opposite decision.'" Id. (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th

Cir. 1995)). If after reviewing the record, the court finds that it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the court must affirm the Commissioner's decision. Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004); Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001).

In order to qualify for Social Security disability benefits, a person must demonstrate an inability to engage in any substantial gainful activity by reason of a medically determinable impairment which has lasted or can be expected to last for not less than 12 months. 42 U.S.C. § 423(d)(1)(A); Barnhart v. Walton, 535 U.S. 212, 217-22 (2002) (both the impairment and the inability to engage in substantial gainful employment must last or be expected to last not less than 12 months).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If so, disability benefits are denied. If not, the Commissioner decides whether the claimant has a "severe" impairment (or combination of impairments), defined in 20 C.F.R. § 404.1520(c) as an impairment which significantly limits a claimant's physical or mental ability to do basic work activities. If the claimant's impairment is not severe, the disability claim is denied. If the impairment is severe, the Commissioner determines at step three whether the claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. In evaluating the severity of mental impairments, the ALJ must make specific findings as to the degree of limitation in each of the following functional areas: activities of daily

14

living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3).

If the claimant's impairment meets or equals a listed impairment, the claimant is conclusively presumed to be disabled. If the impairment is one that does not meet or equal a listed impairment, the Commissioner asks at step four whether the claimant has the RFC to perform his past relevant work. The claimant bears the burden at step four to show that he is unable to perform his past relevant work. Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). If the claimant is able to perform his past relevant work, he is not disabled. If he cannot perform his past relevant work, step five asks whether the claimant has the RFC to perform work in the national economy in view of his vocational factors, i.e., his age, education, and work experience. If not, the claimant is declared disabled and is entitled to disability benefits. 20 C.F.R. §§ 404.1520(a)-(f); Fastner v. Barnhart, 324 F.3d 981, 983-84 (8th Cir. 2003); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).

## ALJ's Evaluation of Plaintiff's Subjective Allegations of Pain

Plaintiff argues that it was improper for the ALJ to rely on the absence of medical treatment and prescription medications in discrediting Plaintiff's allegations of disabling pain, in light of the evidence that Plaintiff could not afford such treatment and/or medications. The fact that Plaintiff was not taking any prescription pain medication clearly supports the ALJ's discrediting Plaintiff's subjective complaints of disabling pain. See, e.g., Masterson v. Barnhart, 363 F.3d 731, 739 (8th Cir. 2004) (in discrediting extent of pain alleged by plaintiff, ALJ properly considered plaintiff's failure to take any

15

narcotic medication for pain but rather only taking non-steroidal anti-inflammatory drugs); Wilson v. Chater, 76 F.3d 238, 241 (8th Cir. 1996) (complaints of disabling back pain were inconsistent with plaintiff's failure to take prescription pain medications).

It is true that "[i]f a claimant truly has no access to health care, then the absence of such care would not tend to disprove her subjective complaints of pain." Harris v. Barnhart, 356 F.3d 926, 930 (8th Cir. 2004). However, in evaluating the credibility of a disability claimant's subjective complaints of disabling symptoms where the individual claims he did not seek medical treatment or prescription medication due to a lack of finances, it is permissible for the ALJ to consider the lack of evidence that the individual sought out medical assistance available to indigents. Id.; Riggins v. Apfel, 177 F.3d 689, 693 (8th Cir. 1999) ("The ALJ also considered [Plaintiff's] admission that he had not taken prescription pain medication for years. Although [Plaintiff] claims he could not afford such medication, there is no evidence that he sought any treatment offered to indigents or chose to forego smoking three pack of cigarettes a day to help finance pain medication."); Murphy v. Sullivan, 953 F.2d 383, 386-87 (8th Cir. 1992). Here, as the Court noted in Plaintiff's previous case, the record is devoid of evidence suggesting that Plaintiff sought any treatment offered to indigents for his alleged pain (or depression).Further, it appears that Plaintiff did not follow his prescribed course of physical therapy, for reasons unrelated to cost.

The Court also notes that ALJ's personal observation of a claimant's demeanor at the evidentiary hearing is a proper factor for the ALJ to rely upon in assessing the individual's credibility. Cruse v. Bowen, 867 F.2d 1183, 1186 (8th Cir. 1989) (in making

16

credibility determinations with regard to complaints of pain, the ALJ may consider his observations of a claimant's demeanor and physical appearance). The ALJ's determination is further supported by the fact that Plaintiff did not allege mental impairments on his application for benefits. See Smith v. Shalala, 987 F.2d 1371, 1375 (8th Cir. 1993) (affirming ALJ's discounting a psychiatrist's report that the plaintiff had disabling mental impairments where, among other things, the plaintiff did not allege a disabling mental impairment in his application for benefits).

In sum, the Court concludes that the ALJ's discounting Plaintiff's subjective allegations of disabling impairments is supported by substantial evidence in the record.

**ALJ's Duty to Develop the Record**

Plaintiff argues that the ALJ failed in his duty to develop the record by not obtaining evidence from Dr. Salzberg regarding his treatment of Plaintiff after the April 2002 car accident. A claimant for disability benefits has the burden of proving a disability, and of furnishing medical and other evidence that can be used to reach a conclusion that he is disabled. 20 C.F.R. § 404.1512(a). Nevertheless, "[w]ell-settled precedent confirms that the ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press the case," and that this duty extends to cases like the present where the claimant was represented by counsel at the evidentiary hearing. Snead v. Barnhart, 360 F.3d 834, 838 (8th Cir. 2004).

Here, as noted above, the ALJ stated that no records were obtained from Dr. Salzberg in response to a request. Such a request is not documented in the record before the Court. However, as the ALJ also noted, Plaintiff did not assert that he sought any

17

treatment from Dr. Salzberg or anyone else since the spring of April 2002 for impairments stemming from the accident. This, coupled with the fact that Plaintiff was not taking any prescription pain medication even after the car accident, leads the Court to conclude that the failure to obtain medical records from Dr. Salzberg does not warrant a reversal of the ALL's decision.

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED**.

An appropriate Judgment shall accompany this Memorandum and Order.

*/s/ Audrey G. Fleissig*
AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated on this 23rd day of August, 2005